**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/6/2019

JENNIFER COLLINS

                        Plaintiff,

       -against-

GIVING BACK FUND and
NEXUS GLOBAL,

                      Defendants.

No. 18 Civ. 8812 (CM)

# MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING COLLINS' MOTION TO SUBSTITUTE DEFENDANT

McMahon, C.J.:

      This is Plaintiff Jennifer Collins' ("Collins") second attempt to bring an action for disability discrimination and intentional infliction of emotional distress against the Giving Back Fund ("GBF"), a not-for-profit organization, and a networking program allegedly funded by GBF called NEXUS Global ("NEXUS"). An earlier case alleging the same facts was voluntarily discontinued as to these two Defendants and dismissed as against a third party against whom Plaintiff recently brought suit in the New York State Supreme Court.

      Presently before the Court is a motion to dismiss filed by both Defendants (Dkt. No. 16), as well as Collins' motion to substitute Jonah Wittkamper, the President of NEXUS, for NEXUS as a party defendant (Dkt. No. 19).

This case can only be understood in conjunction with the first action filed by Collins—*Collins v. Lindstrom*, No. 18 Civ. 6696[1] (the "First Action"). In that case, Collins alleged that Lindstrom—a philanthropist and socialite with whom she had a brief affair—had unfairly caused GBF and NEXUS—an exclusive, social entrepreneurship "summit" and networking platform—to revoke an invitation to a function sponsored by NEXUS that NEXUS had extended to Collins. Collins alleged that the revocation of her invitation constituted disability discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 794, because she suffers from bipolar disorder and post-traumatic stress disorder. Collins also asserted claims against Lindstrom for slander, and against all three defendants for intentional infliction of emotional distress.

Collins voluntarily discontinued her claims against GBF and NEXUS while those three parties tried to reach a settlement. The stipulation of discontinuance inexplicably, but quite explicitly, provided that Collins would bring an entirely new action against GBF and NEXUS if those settlement negotiations failed—which they did. This lawsuit (the "Second Action") was filed when those negotiations broke down.

Meanwhile, Lindstrom—as against whom the claims asserted in the First Action were not discontinued—moved for dismissal of the purely state law claims asserted against him. Because the federal claim on which jurisdiction had been predicated had been voluntarily discontinued, and there was no diversity between Lindstrom and Collins, that motion was granted, without prejudice to Collins' commencing her suit against Lindstrom in the New York State Supreme Court—which she has done.

---

[1] References to "18-cv-6696 Dkt. No. __" refer to documents filed in *Collins v. Lindstrom*, No. 18 Civ. 6696 (S.D.N.Y.). References to "Dkt. No. __" refer to documents filed in the above-captioned case.

Procedurally, this case might seem very confusing. One thing, however, is crystal clear: Plaintiff fails to state any claim against either GBF or NEXUS, and no amendment would permit her to cure her pleading deficiencies. Their motions to dismiss are, therefore, granted.

Moreover, since Collins asserts no claim that would lie against anyone associated with NEXUS (such as its president), her motion to substitute Wittkamper as a party defendant is denied as futile.

## I.    Materials Considered

The record before the Court is, to be frank, a mess. Everyone is represented by counsel, but none of the lawyers seems to know the rules for litigating a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), a district court's analysis is confined to "the allegations contained within the four corners of the complaint." *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 212 (2d Cir. 2017) (internal quotation marks and citation omitted). Beyond the text of the complaint, the Court may consider only documents that are appended as exhibits to the complaint, that are incorporated by reference in the text of the complaint, or that are otherwise "integral" to the allegations contained therein. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).

Here, Collins filed a Complaint. (Dkt. No. 6.)[2] There were no exhibits appended to that pleading.

At the same time she originally tried to file her Complaint (*see* Dkt. No. 2), Plaintiff filed her sworn affidavit, together with twenty-one exhibits (Dkt. No. 3). There are references to this

---

[2]    Originally filed as Dkt. No. 2, but rejected for counsel's filing error.

affidavit and to at least some of these exhibits in the text of the Complaint. It is, therefore, appropriate to consider this contemporaneously-filed document on a motion to dismiss. Defendants certainly considered them part of the pleading; when they filed a motion to dismiss (Dkt. No. 16), they addressed the contents of the affidavit and its exhibits. The Court will consider them in deciding the motion to dismiss; under the rule of *DiFolco*, they were prepared and filed contemporaneously with the Complaint and were referenced therein.

Collins responded to the motion to dismiss on December 13, by filing a motion to substitute a party (Dkt. No. 19). Defendants filed their reply on December 21. (Dkt. No. 20.) Those documents will be considered on the motion to dismiss.

On December 26, 2018, Collins filed a second affidavit—containing additional factual matter and exhibits that were not appended to her original affidavit—with the Clerk of Court. This affidavit and its exhibits will not be considered on the motion to dismiss; it was prepared long after the Complaint was drafted and filed, and it is not referenced in the pleading sought to be dismissed. It is, therefore, stricken from the record on this motion.

Unfortunately, the Court was not fully familiar with the state of the record when, on January 3, 2019, Defendants—having learned of the filing of this second affidavit—sought permission to file a sur-reply in order to respond to its new allegations (rather than ask the Court to strike the affidavit, which is what they should have done). I granted that application. (Dkt. No. 25.) I should not have done so, because the affidavit is not properly part of the record on this motion. So while I did give Defendants permission to file the sur-reply, I will not consider it, and I strike that from the record on the motion to dismiss—with apologies to Defendants, who should not have had to prepare any such documents.

I suggest that, in the future, if these lawyers intend to litigate in federal court, they learn the rules and abide by them.

The statement of facts that follows is drawn entirely from the "four corners of the pleading" as I have deemed it to be—Dkt. Nos 3 and 6—and nothing else.

## II. Statement of Facts

### A. The Parties and Lindstrom

Collins is an entrepreneur. In her email signature she describes herself as an: "Entertainer. Yogi. Writer. Artist. Mental Health Professional. CEO of GTI Enterprises." (Pl. Aff. Exs. H, I.)

In 2017, Collins was engaged as a fundraising consultant for ARC-38, a non-profit located in Duchess County, New York. (Pl. Aff. ¶ 6.)

Defendant NEXUS is a networking group allegedly run by Defendant GBF, a 501(c)(3) non-profit organization incorporated in Massachusetts and headquartered in Los Angeles. (Compl. ¶ 13.) GBF "encourages and facilitates charitable giving by professional athletes, celebrities, high net-worth individuals, existing nonprofit organizations, corporations, and others who truly desire to give back." (*Id.* ¶ 33.) GBF created the NEXUS project to "bridge communities of wealth and social entrepreneurship." (*Id.*) NEXUS' mission is to "connect, inspire, and activate exceptional social innovators and the next generation of influential families around the world." (*Id.*) To facilitate this mission, NEXUS organizes a variety of "summits"—networking events for members, admitted applicants, and featured speakers. (*Id.* ¶ 32.)

Christopher Rockefeller Lindstrom ("Lindstrom"), who is really the central character in this case, is, among other things, "a fifth-generation Rockefeller"—the family synonymous with industrial fortune and philanthropic contributions. (*Id.* ¶ 19.) Lindstrom is a philanthropist and an investor, who invests in organizations that promote economic sustainability. (Compl. ¶¶ 19–

27.) He co-founded CycleEffect, a venture capital firm that invests in companies focused on the "regenerative economy." (*Id.* ¶¶ 22–25.) And, insofar as is relevant here, he is a member of NEXUS. (*See id.* ¶ 26.)

### B. Collins' Interactions with Lindstrom

Collins met Lindstrom in the spring of 2017, in her capacity as a fundraising consultant for ARC-38. (Compl. ¶ 39.) Their initial interactions were purely professional. Lindstrom loaned ARC-38 $184,000 at that time to prevent foreclosure on its property. (*Id.* ¶ 40.) ARC-38 designated Collins to "refinanc[e] . . . and/or renegotiat[e] the terms of the loan." (*Id.* ¶ 41.)[3]

At some point early in their acquaintance, Collins and Lindstrom had dinner. (Pl. Aff. ¶ 13.) Over dinner, Lindstrom mentioned to Collins that he was member of a networking group called NEXUS. (*Id.* ¶ 14.) Collins became fixated on attending the group's annual conference. (*Id.* ¶ 19.) Her application to attend that conference, which was initially accepted and subsequently rejected, is the crux of the present lawsuit.

After Lindstrom informed Collins about NEXUS, she did some research and discovered that it was holding a summit very soon. (Pl. Aff. ¶ 19.) Collins texted Lindstrom to ask if he could secure "a spot" for her at the upcoming event. (Pl. Aff. Ex. C.) Lindstrom responded he could not, but said: "I can endorse you for the US [*sic*] Summit in February." (*Id.*) The USA Summit is an annual NEXUS summit held in Washington, D.C. (Compl. ¶ 71.)

Collins viewed this exchange as some sort of binding commitment by Lindstrom to get her invited to the USA Summit; she attaches the text message to her Complaint as "documentation." (*Id.* ¶ 87; Pl. Aff ¶ 57, Ex. C.)

---

[3]     Collins was never successful able to refinance ARC-38's loan. The Complaint does not explain why the refinancing project failed, although Collins mentions her "shame . . . [in] not being able to successfully lead" the initiative. (Pl. Aff. Ex. E.)

### C.     Collins' Personal Relationship with Lindstrom

At some point the relationship between Collins and Lindstrom became more personal.

Collins arranged to meet Lindstrom for coffee to discuss the terms of the loan to ARC-38. (Pl. Aff. ¶ 10–11.) During this meeting, Collins discovered that Lindstrom was interested in "broader land-stewardship initiatives, cryptocurrency, and health and wellness programs." (*Id.* ¶ 11.) Collins asked to see Lindstrom again to discuss these subjects. (*Id.*)

Lindstrom invited Collins to spend the day at his farmhouse in Hudson, New York "to discuss business affairs." (*Id.* ¶ 12.) During that meeting, Lindstrom viewed nude pictures of Collins on her phone and offered to paint her portrait from those photos. (*Id.* ¶ 17–18.) Collins agreed to the portrait; she would later follow up inquire about the status of this "commission[]." (*Id.* Ex. E.)

Lindstrom and Collins then entered into a consensual sexual relationship. (*Id.* ¶ 26.) Lindstrom invited Collins back to his Hudson farmhouse a second time. (*Id.* ¶ 27.) The two also traveled to New Hampshire to go hiking. (*Id.*)

During the hike trip, Lindstrom told Collins that he was in love with another woman, and that he viewed Collins as his "friend." (*Id.* ¶ 28.) Collins was "devastated" by the news. (*Id.* ¶ 29.)

### D.     Collins' Mental Health Issues

After Lindstrom told Collins that he viewed her only as a friend, Collins "felt" that her "bipolar disorder . . . was triggered." (*Id.* ¶ 30.) Initially, she did not seek medical attention. (*Id.* ¶ 31.) Instead, she sought to obtain an explanation from Lindstrom. (Pl. Aff. ¶¶ 32–35, Ex. E.)

In October 2017, Collins asked to meet Lindstrom to "express [her] emotions and difficulties as a result of the events in New Hampshire." (*Id.* ¶ 32.) Lindstrom agreed to a meeting, but apparently the two spent the time discussing "mutual business interests." (*Id.* ¶ 34.)

After a few weeks of reflection, she e-mailed Lindstrom on November 15, 2017. (*Id.* Ex. E) In that note, she discussed her "disappoint[ment]" in the "pain of [Lindstrom's] false courtship," and told Lindstrom that his lack of follow-through on certain unspecified promises "triggered" her "to the point of being unable to sleep." (*Id.*) Those broken "promises" included Lindstrom's failure to paint a nude portrait of Collins and his failure to introduce Collins to his "network," which supposedly would have helped Collins complete the refinancing of ARC-38's loan. (*Id.*) Collins also asked how she could "move forward with an endorsement for NEXUS," as she still wanted to attend the upcoming conference. (*Id.*)

Lindstrom did not respond to Collins's email. (Compl. ¶ 69.)

### E. Hospitalization

On November 18, 2017, Collins sought care at the Maimonides Hospital in Brooklyn, New York, for "psychiatric purposes." (*Id.* ¶ 70.) She remained at the center for ten days. (Pl. Aff. Ex. F.)

According to Collins, she had "episodes . . . directly related to feeling used and silenced by" Lindstrom. (*Id.* ¶ 37.) Doctors at the hospital gave Collins a sedative. (*Id.*)

### F. NEXUS Reaches Out

On December 7, just a week after her release, Collins received an email from NEXUS. (*Id.* Ex. G.) The email contained information about upcoming NEXUS events. (*Id.*) Collins construed the email as an "Invitation," albeit not a "personalized" one, since it included a link to the organization's monthly newsletter. (*Id.*)

Collins forwarded the message from NEXUS to Lindstrom. (Pl. Aff. ¶ 40.) In her email, Collins informed Lindstrom that she intended to apply to the USA Summit. (*Id.*) She also asked

that he join her at a separate NEXUS event "to spend time together in a smaller group setting." (*Id.*)

Lindstrom did not respond. (*See* Compl. ¶ 78.)

The next day, Collins forwarded Lindstrom her completed application for the USA Summit by email. (Pl. Aff. Ex. H.) She advised Lindstrom that she had "used his name" on her application, and made a suggestion: "anything [Lindstrom] could do to ensure an invitation [to the Summit] would be greatly appreciated." (*Id.*)

Lindstrom did not respond. (*See* Compl. ¶ 78.)

Three days later, on December 11, Collins emailed Lindstrom again. She asked to meet with him to discuss "any . . . all . . . or just a few of the things we have in common." (Pl. Aff. Ex. I.)

Lindstrom did not respond.

That evening, Collins emailed Lindstrom for the second time. She expressed frustration that Lindstrom had not responded to her efforts to see, speak, or "brainstorm" with her. (Pl. Aff. Ex. J.)

Finally, Lindstrom responded. (*Id.* ¶ 46.)

He sent Collins an email stating he was "not going to work with her when [she] act[ed] like this." (*Id.* Ex. K.) In his note, Lindstrom called Collins "overbearing," "manic," and expressed his discomfort that Collins was "trying to insert [herself] into [his] networks and projects without . . . [his] approval." (*Id.*)

Collins responded by text message, informing him that her "mania" was "triggered" by Lindstrom's failure to keep promises. (*Id.*) Collins also accused Lindstrom of "taking advantage

of his power to engage with [her] sexually," even though, in her affidavit, Collins describes her sexual relationship as "consensual." (*Id.*; Pl. Aff. ¶ 26.)

Lindstrom did not respond. Instead, he "blocked" Collins from sending messages to his phone. (*See* Pl. Aff. Ex. N.)

### G.    USA Summit

On December 21, Collins attended the NEXUS event she had learned about in the email. (*Id.* Ex. G.) Collins alleges that she met NEXUS members at this event "who [were] happy to endorse me for [the] summit," although she never identifies them. (*Id.* Ex. N.)

A few days later, on December 24, the NEXUS team sent Collins an email stating that she had been accepted to the USA Summit. (*Id.* Ex. L.)

On December 26, Collins forwarded this note to Lindstrom "to keep [him] in the loop."[4] (*Id.* Ex. M.)

Lindstrom responded by email on January 5, 2018, telling Collins that he viewed her repeated efforts to communicate with him as "harassment." (*Id.* Ex. N.) He told Collins that he intended to block her emails, as he had already done with her phone calls and text messages. (*Id.*) Lindstrom also told Collins that he planned to tell the NEXUS organization that Collins was "not a fit for the NEXUS community," and that she had used him as a reference without his "full consent." (*Id.*)

Collins sent an email back to Lindstrom, promising that her "connection [with Lindstrom] would never be the same." (*Id.*) "[T]he more you try to silence me, the harder I am going to fight back." (*Id.*)

---

[4]    Collins informed Lindstrom she "received a scholarship" to the event. (Compl. ¶ 80; Pl. Aff. Ex. M.) However, Collins' own exhibits reflect that while she requested a full scholarship from NEXUS, that request was never acknowledged nor granted. (Pl. Aff. Ex. L.)

## H.    NEXUS Revokes Collins' Acceptance

Lindstrom contacted NEXUS the following day. While acknowledging that NEXUS could invite anyone it liked to the USA Summit, he said that Collins had listed his (Lindstrom's) name as a reference without his consent and had been harassing him for months. Lindstrom stated that he did not recommend that Collins become a member of the NEXUS community. (*Id.*)

On January 15, NEXUS rescinded Collins' acceptance to the USA Summit. (Pl. Aff. Ex. O.)

Collins responded with three emails to NEXUS over the next two days. (*Id.* Exs. O–P.) Among other things, she speculated that NEXUS rescinded her acceptance because (*i*) Lindstrom sought to silence Collins about their "personal relationship," which Lindstrom exploited to "engage with [Collins] sexually;" (*ii*) unnamed "powerful men" wanted to silence "female leaders;" (*iii*) NEXUS wanted to avoid a "situation of blatant personal vendetta and silencing." (*Id.*)

On January 18, NEXUS sent two emails to Collins in response. (*Id.* Ex. Q.) In its first email, NEXUS relayed that it had shared Collins' messages about Lindstrom with its "Values Council," which is "an independent body of NEXUS members who review and evaluate 'red flags' raised about or members on a monthly basis in relation to upholding the NEXUS Values and community code of conduct."[5] (*Id.*) In its second email, NEXUS advised Collins that no decision about her complaints about Lindstrom would be made prior the USA Summit, but that the Council would inform Collins if she were ever to be considered for future events. (*Id.*)

---

[5]    The NEXUS Community Code of Conduct includes the directive that NEXUS does not "tolerate harassment." (Pl. Aff. Ex. R.)

Later that day, Collins responded via email, expressing pleasure "with initial steps" that NEXUS had taken. (*Id.* Ex. S.) However, she asked that NEXUS take further action "to ensure [her] voice as a person with bipolar disorder and complex PTSD is adequately heard." (*Id.*) Collins directed that such a "space" was "absolutely necessary" based on the "#metoo and Times Up" movements. (*Id.*)

NEXUS apparently did not respond.

Collins then commenced litigation by filing the First Action.

## III.   Procedural History

### A.   The First Action

About six months after Collins' acceptance to the USA Summit was revoked, she commenced the First Action. (*See* 18-cv-6696 Dkt. No. 1.) She asserted the following causes of action: (*i*) defamation against Christopher Rockefeller Lindstrom, (*ii*) intentional infliction of emotional distress against Lindstrom, NEXUS, and GBF, and (*iii*) a violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against NEXUS and GBF. (*Id.* ¶¶ 90–111.)

Just over a week later, on August 10, 2018, GBF, NEXUS and Collins filed a stipulation of voluntary dismissal. (18-cv-6696 Dkt. No. 12.) The stipulation provided that Collins would file a new action against GBF and NEXUS if the parties failed to execute a settlement. (*Id.*) The Court so-ordered this stipulation of partial discontinuance on September 21, 2018. (18-cv-6696 Dkt. No. 25.)

This left Lindstrom as the only party defendant in the First Action. He immediately filed a motion to dismiss, and sought sanctions against Collins. (18-cv-6696 Dkt. Nos. 13, 28.)

On November 26, 2018, this Court granted Lindstrom's motion to dismiss but denied his motion for sanctions. (18-cv-6696 Dkt. No. 39.)

On March 4, 2019, Collins filed a lawsuit against Lindstrom in state court, where it remains pending. *Collins v. Lindstrom*, No. 500275/2019 (Sup. Ct., Kings Cty.).

### B.     The Second Action (This Case)

Collins failed to consummate a settlement with NEXUS and GBF.   Therefore, on September 26, 2018, she filed a new Complaint—the present lawsuit—against those two entities. She did not list Lindstrom in the caption of her new lawsuit and did not obtain or serve him with a summons in this action. (Dkt. Nos. 11–12.) In fact, at the same time she filed this lawsuit, she was actively litigating against Lindstrom in the First Action.

Nonetheless, aside from the caption, the Complaint in this action is a carbon copy of the one filed in the First Action.  Not only does it assert all of the factual allegations against Lindstrom, it includes all of the claims against Lindstrom that were being litigated, and that were eventually dismissed, in the First Action—claims that Plaintiff presumably asserted against Lindstrom in the action she filed in the New York State Supreme Court earlier this year.

Between the parties' agreeing that a second action would be filed and counsel's negligent failure to edit the claims against Lindstrom out of the instant complaint, they have managed to generate considerable confusion.   I conclude, however, that Plaintiff did not intend to sue Lindstrom in this lawsuit.

In the Second Circuit, when claims are asserted in the body of a pleading but that party is not named in the caption, the "intent of the pleader" determines whether that person should be treated as a party defendant:  "The caption, pleadings, service of process and other indications of the intent of the pleader, are evidence upon which a district court will decide, in cases of doubt, whether an entity has properly been made a party to a lawsuit." *Nationwide Mut. Ins. Co. v.*

*Kaufman*, 896 F. Supp. 104, 109 (E.D.N.Y. 1995) (citing *Jones v. Griffith*, 870 F.2d 1363, 1365 (7th Cir.1989)).

In this case, it is clear that Plaintiff did not intend to name Lindstrom as a party defendant in the Second Action. We know this because (1) she stipulated to bring a separate lawsuit against NEXUS and GBF, which she has in fact done; (2) she continued to litigate her claims against him in the First Action; and, (3) when that case was dismissed without prejudice, she sued Lindstrom in the New York State Supreme Court.

Therefore, the claims against Lindstrom are stricken from the Complaint as irrelevant surplusage. They will not be considered further.

### C.    Present Motions

On December 10, 2018, Defendants GBF and NEXUS filed a motion to dismiss. (Dkt. No. 16.) They argue that the Complaint (*i*) fails to state a claim upon which relief can be granted; and (*ii*) does not plead facts from which the Court can infer that NEXUS is a legal entity with the capacity to be sued.

In response to the second issue, Collins moved on December 13, 2018, seeking to substitute Jonah Wittkamper, the President of NEXUS, as Defendant in place of NEXUS. (Dkt. No. 19.) Jonah Wittkamper is the President of NEXUS. Collins alleged that, under N.Y. Gen. Ass'ns Law § 13, he could be held accountable for any alleged disability discrimination and intentional infliction of emotional distress perpetrated by NEXUS. (Dkt. No. 19 at 2.)

### IV.    Standard of Review

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), the Court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC,*

570 F.3d 471, 475 (2d Cir. 2009) (internal quotation marks omitted). The claims will survive the motion to dismiss as long as they contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Collins must do more, however, than merely attach "labels and conclusions" to bald factual assertions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. A plaintiff must plead facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013).

A complaint fails to state a claim "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679; *Ruston v. Town Bd. for Town of Skaneateles*, 610 F. 3d 55, 58–59 (2d Cir. 2010). The Court accepts as true all well-pleaded factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements for a cause of action." *Iqbal*, 556 U.S. at 678.

## V. Discussion

### A. Defendants' Motion to Dismiss is Granted

#### 1. The Claims Against NEXUS Are Dismissed Because NEXUS Cannot Be Sued

NEXUS moves to dismiss the claims asserted against it because it is not a legal person and so cannot be sued. The motion is GRANTED.

NEXUS is not alleged to be either a corporation or a partnership, or any sort of entity with independent legal status. It is some sort of private networking group that is a "project" of GBF. *Cf. Hamad v. Ctr. for Study of Popular Culture*, No. A-06-CA-285-SS, 2007 WL 9701889, at *1 n.1 (W.D. Tex. Jan. 17, 2007), *aff'd sub nom. Hamad v. Ctr. for Jewish Cmty. Studies*, 265 F. App'x 414 (5th Cir. 2008) ("Although Plaintiff continues to name Campus Watch as a defendant in his filings, this organization is not a legal entity but a project of the nonprofit organization Middle East Forum.") The most that can be said is that NEXUS is an "association" of persons with common interests.

Pursuant to Section 13 of New York's General Associations Law, entitled "Action or proceeding against unincorporated association," "An action or special proceeding may be maintained, against the president or treasurer of such an association . . . upon any cause of action, for or upon which the plaintiff may maintain such an action or special proceeding, against all the associates, by reason of their interest or ownership in . . . or their liability therefor, either jointly or severally." For purposes of Section 13, "Any partnership, or other company of persons, which has a president or treasurer, is deemed an association within the meaning of this section."

It would appear, then, that as long as NEXUS has a president, its president can be named as the defendant on any claim for which the entire association would be liable. And indeed, Plaintiff has moved for leave to substitute NEXUS' President, Jonah Wittkamper, the President of NEXUS, as the party Defendant on her claims against NEXUS.

However, even if I were to substitute Wittkamper as the named Defendant on the claims against NEXUS, the complaint would have to be dismissed—because Plaintiff fails to state any claim against the association on which she can recover.

**B.    Plaintiff's Claim under the Rehabilitation Act Is Dismissed With Prejudice**

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination against qualified individual with disabilities by certain programs receiving government funding.

To state a claim for a violation of the Rehabilitation Act, Collins must plead: (1) that a program receives federal funding; (2) that she is "disabled" within the meaning of the Act; (3) that she is otherwise qualified for a program; and (4) that she was excluded from that program solely because of her disability. *Putkowski v. Warwick Valley Cent. Sch. Dist.*, 363 F. Supp. 2d 649, 654 (S.D.N.Y. 2005).

However, the Rehabilitation Act claim must be dismissed, because Collins fails to plead (*i*) that she was denied access to a program that receives federal funding, and (*ii*) that she is a "qualified individual" under Section 504 of the Act.

The Court agrees with both arguments.

**1.    Collins Fails to Allege that She Was Excluded From a Program that Receives Federal Funding**

Collins does not specifically allege that she was excluded from a program that receives federal funding. Nor does she allege facts from which it could be inferred that NEXUS—the program from which she was excluded—receives federal funding.

However, she pleads that NEXUS is a "project" of GBF, and that GBF received a federal grant in the amount of $492,357, from the Regional Innovation Strategies Program from the United States Economic Development Administration, for some unspecified purpose. (Compl. ¶¶ 33–35.) The question is, is that sufficient to plead that Plaintiff was excluded from a federally funded program for purposes of the Rehabilitation Act?

It is not.

There are four separate types of entities whose operations can be considered "programs or activities" under the Act:

> For the purposes of this section, the term "program or activity" means all of the operations of—
>
> (1)
>
>> (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>>
>> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
>
> (2)
>
>> (A) a college, university, or other postsecondary institution, or a public system of higher education; or
>>
>> (B) a local educational agency (as defined in section 7801 of Title 20), system of career and technical education, or other school system;
>
> (3)
>
>> (A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship--
>>
>>> (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or
>>>
>>> (ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or
>>
>> (B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or
>
> (4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b).

Obviously, the only category that might conceivably apply to NEXUS or its alleged sponsor, GBF, is paragraph (3). Neither Defendant is a governmental entity or an educational institution, and nothing in the Complaint suggests that either Defendant was established by two or more entities subject to Section 504 of the Rehabilitation Act. GBF is a private organization that serves as a platform for private philanthropy. Viewing the allegations of the Complaint most favorably to Collins, GBF sponsors various projects, of which NEXUS is one.

The Complaint does not specifically allege that GBF received federal funding for NEXUS. However, that is not necessarily fatal to the Complaint. All of the operations of a private entity like GBF—the "entire" private organization, including all its programs—will be subject to Section 504 as long as GBF meets one of two disjunctive conditions under the statute:

> (i) it receives Federal financial assistance "as a whole;" or
>
> (ii) it is "principally engaged" in one of the enumerated businesses—education, health care, housing, social services, or parks and recreation.

*See id.* § 794(b)(3)(A)(i)–(ii).

Collins' Complaint fails to plead that GBF qualifies under either condition. I will discuss them in reverse order.

First, Collins has not plausibly pleaded that either GBF or NEXUS is "*principally* engaged in the business of providing education, health care, housing, social services, or parks and recreation." *Id.* § 794(b)(3) (emphasis added). "Principally engaged" has been interpreted to mean "the primary activities of a business, excluding only incidental activities." *Doe v. Salvation Army in U.S.*, 685 F.3d 564, 571 (6th Cir. 2012). The modifier "principally" is significant, not merely because the statute's plain text requires as much, but because legislative history clearly shows that

Congress intended the Rehabilitation Act to apply only to organizations that act as government surrogates by providing what are traditionally conceived of as "public services." As the Seventh Circuit explained in *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. and N.W. Ind.*, 786 F.3d 510 (7th Cir.2015):

> When read in context [], the passages from the legislative history [] explain why the provision was limited to covering organizations providing the enumerated services. *See* S. Rep. No. 100–64, at 4, 1988 U.S.C.C.A.N. 3 at 6 ("if the corporation provides a *public service*, such as social services, education, or housing, the entire corporation is covered"); *id.* at 18 (explaining that the bill under consideration would cover "private entities ... that provide services that *are traditionally regarded as within the public sector*, i.e., those enumerated in part (3)(A)(ii) of the definition of 'program or activity' "); *id.* at 20 ("Even private corporations are covered in their entirety ... *if they perform governmental functions*, i.e., are 'principally engaged in the business of providing education, housing, social services, or parks and recreation.'").

*Id.* at 525 (emphasis added).

Both the language of the statute and the legislative history indicate that the Rehabilitation Act does not reach organizations like GBF or NEXUS. The Complaint alleges that GBF "sets up donor-advised accounts for celebrity performers and athletes" (Compl. ¶ 13) and "encourages and facilitates charitable giving by professional athletes, celebrities, and high net-worth individuals" (Compl. ¶ 33). It also alleges that NEXUS "connects, inspires, and activates exceptional social innovators and the next generation of influential families around the world." (Compl. ¶ 31.) None of this suggests that GBF or NEXUS is engaged at all—let alone "principally"—in providing the sort of "social services" that are traditionally provided by the public sector (education, health care, housing, or parks and recreation). NEXUS is an exclusive networking group for the rich and famous—the antithesis of a social services provider. As the Seventh Circuit has explained, private membership organizations that do not perform government functions do not qualify for clause

(ii)'s "categorical exemption" to the rule that private entities are not comprehended in the scope of the Act. 786 F.3d at 526.

Nor does the complaint allege that either GBF or NEXUS receives federal funding "as a whole." For purposes of clause (i), the phrase "as a whole" means that federal assistance is extended to the organization otherwise than for some specific purpose—put differently, that the recipient of federal funds received those funds as general assistance. S. Rep. No 100-64, at 17 (1987), *as reprinted in* 1988 U.S.C.C.A.N. 3, 19. The report is quite specific that "federal financial assistance that is earmarked for one or more facilities of a private corporation or other private entity when it is extended is not assistance to the entity 'as a whole.'" *Id.* Additionally, "Federal aid which is limited in purpose . . . is not considered aid to the corporation as a whole[.]" *Id.*

It has been repeatedly held that federal funding to a private entity not primarily engaged in education, health care, housing or parks and recreation, when that funding is earmarked for a particular project or site within the entity's operations, is not "as a whole" federal funding for purposes of the Rehabilitation Act. Instead, Section 504 is "program specific" as to such enterprises. *Boswell v. SkyWest Airlines, Inc.*, 217 F. Supp. 2d 1212, 1216 (D. Utah 2002), *aff'd*, 361 F.3d 1263 (10th Cir. 2004). "Though Congress chose to broaden the definition of 'program or activity' as it relates to 'all of the operations' of certain public entities, it did not do the same for private ones." *Dana v. Baker Hughes, Inc.*, No. 14-cv-01861, 2015 WL 5576880, at *10 (M.D. Pa. Sept. 21, 2015); *see also Blair v. Bank of America, N.A.*, No. 10-CV-946-SI, 2012 WL 860411, at *5 (D. Or. Mar. 13, 2012), *aff'd*, 573 F. App'x 665 (9th Cir. 2014); *Squire v. United Airlines*, 973 F. Supp. 2d 1004 (D. Colo. 1997); *Phillips v. Goldsteins' Rosenbwergs' Raphael-Sachs, Inc.*, No. CIV. A. 12-3833, 2013 WL 6506160, at *5 (E.D. Pa. Dec. 10, 2013).

The Complaint in this case alleges that GBF, the sponsor of NEXUS, received a single $492,357.00 federal grant. (Compl. ¶ 35.) The Complaint does not allege that this constitutes funding "as a whole;" neither does it allege that this funding had anything to do with NEXUS. Therefore, the Complaint fails to allege that plaintiff was excluded from a "program or activity receiving Federal financial assistance," as required to state a claim for a violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(a).

Ordinarily I would dismiss with leave to replead. However, a public record of every federal grant is accessible on a federal agency's website. The court can take judicial notice of adjudicative facts contained on government websites, because that information "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Schwartz v. U.S. Drug Enforcement Admin.*, No. 16-750-CV, 2017 WL 2451976, at *1 (2d Cir. June 6, 2017) (summary order), citing Fed. R. Evid. 201. Therefore, it is possible for the Court to assess whether granting leave to amend would be futile in this instance.

Amendment would indeed be futile. The grant pleaded in the Complaint was awarded for the benefit of a GBF-sponsored project called the City Innovate Foundation (CIF), and is specifically directed to CIF's San Francisco regional program. *See* 2017 Awardees, Giving Back Fund, Inc., https://www.eda.gov/oie/ris/i6/2017/awardees/giving-back-fund.htm. Such a grant does not qualify as funding to GBF "as a whole," and so does not sweep in any of its other projects—including specifically NEXUS. To the extent that the grant renders GBF's operations subject to the Rehabilitation Act, it is "project specific" to CIF.

### 2. Collins Does Not Plausibly Allege that She Is a Qualified Individual Within the Meaning of the Rehabilitation Act

Obviously, there is no need to go further; the fact that Plaintiff fails to link the event from which she was excluded to any qualified "program or activity" dooms her Rehabilitation Act claim

without more.  But there is a second reason why the Complaint must be dismissed:  Plaintiff does not plead facts that enable the Court to plausibly infer that she qualifies as an "individual with a disability," as that term is used in the Act.

To qualify as an individual with a disability within the meaning of Section 504, Collins must plead that (*i*) she suffers from a physical or mental impairment; (*ii*) that the impairment affects a "major life activity;" and (*iii*) that the impairment "substantially limits" the major life activity.  *See Bragdon v. Abbot*, 524 U.S. 624, 630–31 (1998) (discussing definition of "disability" under the Americans with Disabilities Act ("ADA")) (citing 42 U.S.C. § 12102(2)); *see also B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 159 (2d Cir. 2016) (noting that "Section 504 expressly incorporates . . . the ADA's definition").

There is no dispute that Collins has satisfied the first element.  Collins pleads that she suffers from a mental impairment.  Both bipolar and post-traumatic stress disorders are listed as examples of "impairments" that have the potential to "substantially limit" a major life activity in the relevant Equal Employment Opportunity Commission regulations.  *See* 29 C.F.R. § 1630.2(j)(3)(iii) ("It should be easily concluded that ... bipolar disorder, post-traumatic stress disorder . . . substantially limit brain function [and] may substantially limit additional major life activities.").  Numerous courts have similarly concluded that these disorders constitute "disabilities" within the meaning of the Rehabilitation Act.  *See, e.g., Whalley v. Reliance Grp. Holdings, Inc.*, No. 97-cv-4018, 2001 WL 55726, at *4 (S.D.N.Y. Jan. 22, 2001) (bipolar disorder recognized as "mental impairment"); *Andino v. Fischer*, 698 F. Supp. 2d 362, 370 (S.D.N.Y. 2010) (post-traumatic stress disorder recognized as "disability").

However, Collins does not plead facts from which the Court can infer that that these disorders "substantially affected" her ability to perform any "major life activities." 29 U.S.C. § 794; *see also Whalley*, 2001 WL 55726, at *5.

Major life activities include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Bragdon*, 524 U.S. at 638–39 (citing 45 C.F.R. § 84.3(j)(2)(ii); 28 C.F.R. § 41.31(b)(2)). The term "'[s]ubstantially limits' is not meant to be a demanding standard," *see* 29 C.F.R. § 1630.2(j)(3)(i), but, "It is well-established that an impairment does not significantly restrict a major life activity if it results only in mild limitations." *Whalley*, 2001 WL 55726, at *4 (citing *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 151 (2d Cir. 1998)). Courts require a plaintiff to do more than simply allude to her impairments in her pleading; she must plead *how* those impairments significantly impacted her major life activities, or she will not survive a motion to dismiss. *See Schwartz v. New York State Ins. Fund*, No. 17 CIV. 8973 (LGS), 2018 WL 3442962, at *5 (S.D.N.Y. July 17, 2018); *Graham v. Macy's Inc.*, No. 14 Civ. 3192, 2015 WL 1413643, at *3 (S.D.N.Y. Mar. 23, 2015).

Here, Collins has not pleaded how her bipolar and post-traumatic stress disorders affect her in any major life activity. The Complaint is devoid of any allegations tending to show that these conditions had a significant impact on her ability to ability to care for herself, perform manual tasks, walk, see, hear, learn, speak or breathe.

Nor does the Complaint plead facts tending to show that her condition substantially impaired her ability to work. Collins affirmatively pleads that she is the CEO of GTI Enterprises and the founder and executive director of a non-profit organization. (Compl. ¶ 29; Pl. Aff. Ex. H.) She was tasked with duties like renegotiating loans, and she actively sought out networking

opportunities. Rather than explaining how her bipolar disorder and PTSD have negatively affected her ability to work, Collins' complaint actually extols her professional accomplishments.

Collins alleges that she spent ten days hospitalized in a psychiatric ward. (Pl. Aff. Ex. F.) But short hospitalizations, even when coupled with continued treatment, do not automatically establish that a plaintiff suffers from a substantially limiting condition.

The Second Circuit's decision in *Colwell v. Suffolk County Police Department*, 158 F.3d 635 (2d Cir. 1998) (superseded by statute on other grounds), is instructive. There, a police officer was hospitalized for one month to treat a physical impairment and was out of work for a total of seven months. *Id.* at 640. The court concluded that this was not sufficient to qualify as a "substantial impact" on the officer's "major life activity," because "the non-particularized and unspecific residual limitations described on his police work [was] of too short a duration and too vague an extent to be 'substantially limiting.'" *Id.* at 646.

If Colwell's temporary disability was not enough to qualify him as an "individual with a disability" for Rehabilitation Act purposes, Collins' far briefer hospitalization can hardly qualify. According to her own pleading, within days after her discharge, Collins was submitting an application to attend the NEXUS Summit and, in fact, attended another NEXUS event. Those well-pleaded facts do not smack of a substantial limitation on Collins' ability to work. *Cf. Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 88 (2d Cir. 2010) (summary order) (finding no evidence of a substantial limitation where "The record contains no medical evidence other than a doctor's note clearing Ragusa to return to work following her surgery").

Even so, in other circumstances, I might grant Collins leave to amend to try to assert facts from which a substantial limitation could be inferred. However, because of her failure to plead that she was excluded from a qualified "program or activity," that, too, would be futile.

## C. Collins' Intentional Infliction of Emotional Distress Claim Is Dismissed

The Rehabilitation Act claim is the only federal claim in the case. However, it appears that the court may have original diversity jurisdiction (not just supplemental jurisdiction) over the claim of intentional infliction of emotional distress, since Collins is a New York resident and GBF is a citizen of Massachusetts.

That claim, too, must be dismissed with prejudice.

Intentional infliction of emotional distress ("IIED") is a highly disfavored cause of action under New York law, one that is almost never successful. In order to prevail, a plaintiff must demonstrate conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir.1999) (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)). The standard is virtually impossible to meet.

Collins does not even come close.

"Acts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of [IIED] because the conduct alleged is not sufficiently outrageous." *Lydeatte v. Bronx Overall Econ. Dev. Corp.*, No. 00-cv-5433, 2001 WL 180055, at *2 (S.D.N.Y. Feb. 22, 2001). Being disinvited from a networking event may be disrespectful or harassing, but it falls well short of being outrageous. This claim is dismissed with prejudice.

## D. The Cross Motion to Substitute Wittkamper for NEXUS is Denied as Moot

Obviously, the dismissal with prejudice of all claims pleaded in the Complaint moots Collins' effort to substitute Wittkamper as a Defendant in place of NEXUS.

## Conclusion

The only plausible inference that can be drawn from the allegations of the pleading and the affidavit attached thereto and its exhibits is that Collins was dropped from the NEXUS Summit because Lindstrom told NEXUS officials that she represented a risk. Collins cannot make a federal case out of her rejection.

The motion to dismiss is granted. All claims asserted against NEXUS and GBF are dismissed with prejudice and with costs to Defendants. As the claims against Lindstrom were already dismissed, and so have been stricken from the pleading at issue, there is nothing left of this case.

Dismissal is with prejudice and with costs to the Defendants.

The Clerk of Court is directed to remove the motions at Dkts. Nos. 16 and 19 from the court's list of open motions, and to close the case.

This "written opinion" constitutes the decision and order of the Court.


Dated: August 6, 2019


_____
Chief Judge


BY ECF TO ALL PARTIES